Good morning, Your Honors. Congratulations to the Court. We're at the end of your amendment this month. May it please the Court, my name is Stephen McClary. I represent the Workers' Compensation Commission, and I'm here today to ask you a question on the basis of the appeal. I'm going to summarize what I thought were the salient facts in this case, that form the basis of the appeal. It seems like you understand these facts. That segues into my first question, and may further expedite proceedings. As I read your briefs, Capilwell does not contest that the injuries the claimant incurred prevented him from returning to the former occupation as a mill operator. That's correct. The claim of error addresses the question whether the claimant sustained his burden of proving an impairment of earnings. Is that the focus? That's correct. That's correct. And that's the first of the two issues that are presented. And obviously the second issue is ancillary to how you resolve the first issue. This first issue regards whether or not the Commission's decision in awarding benefits under the provisions of 8D1 is appropriate and supported by the record. It would be the contention, obviously, as indicated in our briefs, that without a job, earning capacity at the time of the arbitration hearing, that there is no loss of income, no actual loss of income from which the Commission could attach that type of award. We certainly believe that Mr. Santoyo is entitled to an award. We just don't believe that he's entitled by law to an award of 8D1 benefits on the basis of these facts. And those facts, again, are he was not working at the time of the arbitration hearing. He had found a position on his own in March of 2006 at a security company. He was obviously earning wages that were less than what he earned when he was working for my client. He worked in that position for about two, two and a half months, left the position voluntarily, according to his testimony, because it was decided between me and his wife that he would stay home and she would work. So he's not in the labor market at that point, at the time of the arbitration hearing. You're arguing, apparently, that his employment at the Securitex is too far removed to be speculative? Is that what you're lying about? I'm arguing, Your Honor, that if you've taken yourself out of the labor market as of the arbitration hearing date, and that being the date that crystallizes these issues, that you're not entitled to a wage differential award. Well, why would it be if the wage differential is calculated not based on zero, but based upon what you could earn, what you're capable of earning? I mean, wage differential is for the impairment of the earning capacity. This isn't like TTD. It's entirely different than TTD. So let's say that a man, whatever his injury is, and everybody agrees that he can no longer work at his $30 an hour job, and the best he could ever earn in the marketplace is $8 an hour. And he says, well, I don't want to work anymore. I'm not going to work anymore. Isn't he still entitled to the $22 an hour of impairment that he suffered by reason of his injury? Well, I would disagree with that assessment because I think that it's not an actual I think what we are talking about at that point is a theoretical, based upon facts, but a theoretical loss of wages versus an actual loss of wages at the time of the arbitration hearing. An actual impairment of his earning capacity at the time of the arbitration. He's certainly entitled to an award, and probably to a substantial award under permanent partial disability either under 8D2 or under, probably likely under 8D2 or under 8E for the specific loss. But the question of whether or not you need, this really, Chris, the issue really comes down to this. Do you need to work in order to prove a wage differential clause? I'm asking my next question. Does he have to be working at the date of the arbitration hearing to be able to recover on a wage differential award? Well, I'm suggesting that he has to, but this case goes further than that. This is someone that is not in the labor market anymore. He's taken himself out. I want to read to you exactly what 8D1 says, and then I'm going to ask my question again. He is supposed to receive an amount equal to 66.2% of the difference between the average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident. We don't argue about that. And here comes the last phrase. And the average amount which he is earning or is able to earn in some suitable employment or business after the accident. You want us to read out or is able to earn from the statute. I don't, Your Honor. You want us to compute it only based upon what he's, in fact, earning. You want to equate this to TTD. No. This is not TTD. No. In response to what you're saying, two responses. First of all, my original statement was that you're not able, actually consistent with my original statement, that you're not, your earnings aren't impaired if you're not working. You're not able to earn money if you're not in the labor market. That's my primary position with respect to whether or not you're entitled to a wage differential award. That's the first position. The second position is that, and I have it open to that same provision that you're reading. And it's not written into the commission decision because the commission adopts the arbitrator's award. But if you read the arbitrator's award, they refer to this employment with the security company as being the suitable employment. It's also, by the way, fits within the range of the voc rehab expert who said he's capable of earning between $8 and $12 an hour. I don't disagree with you. Okay. So we have a voc rehab expert that puts him at that rate. Right. And we've got a prior employment that puts him at that rate. But we're back to my other question. If a man's earning capacity has been impaired and we can identify the amount of the impairment vis-à-vis hourly wage, why is he not entitled to that under a voc rehab award even though he chooses not to work? Because I we don't think that that's the reasonable interpretation of that particular clause of 81. I think that the interpretation of ‑‑ I think that's a condition, this portion of the clause of 81 which states is able to earn in some suitable employment or business after the accident is a condition on the previous statement, which talks about is able to earn. So, and you're probably saying, well, what am I talking about? Okay. What I'm talking about is let's suppose that Mr. Santoy or someone, an employee, has a ‑‑ returns to work in a lesser capacity but returns to a minimum wage job where they could obviously earn something more but not up to what they were earning at the time of the accident or at the time of the arbitration hearing. Well, you couldn't come into the commission and claim ‑‑ That's due free. That's due free, Oliver. We understand that. You can't go out and purposefully take a lower paid job. Right, right, right. And I'm saying it cuts both ways. Let's get to the point you wanted to go to. I'm saying it cuts ‑‑ that particular provision cuts both ways. You can't go out and get a lower paying job because you have to prove what you're able to earn. And you also can't, as an employer, as in the Smith case that's cited by counsel in his brief, manufacture a wage for your returning employee where they wouldn't obviously be able to earn that wage because of their impairment. I think that's where the ‑‑ I think that's what conditions that earlier statement. Because if you accept the award, then you've let ‑‑ how can you not let the genie out of the bottle at that point? How is it that under your ‑‑ under the hypothetical that you asked me about, that you could not work, receive social security disability for a number of years, have your arbitration hearing, and then be entitled to a wage differential award? The purpose of the wage differential is to compensate him for the loss of the ability to engage in his usual and customary line of employment. That's what it's for. That's the first line. Many people suffer injuries, very, very serious injuries, where they're not entitled to a wage differential award because even in spite of their serious injury, they can still do their customary line of employment. So what do we give them? We give them a percentage of a body part or we give them a percentage of a person as a whole. But the wage differential award is for the person who can no longer engage in his customary line of employment. So he's got to engage in some other employment. Right. I agree with you. But I still believe that we're talking about actual impairment. Well, see, that's the problem that we ‑‑ that I'm having here. I believe you acknowledged earlier in response to a question that the claimant does not have to actually be working at the time that the award is given, correct? Correct. And yet you sort of subtly come back to that because then you say, well, I recognize the statute, and it's true, Your Honors, he doesn't have to be working. But here, since he's not working, there's nothing to base it on. Well, I said that he needs to be in the labor market looking for work. That's nowhere in the act. This act is pretty simple. You compensate for physical injury loss. That's right. Right. And 8D compensates for economic injury and loss. And actually, I agree with you, Your Honor. But actually, let me back up a little bit. Actually, what I said, Your Honor, was that I think you have to be working. And I think this case goes further because not only was he not working, but he was not looking for work because he had taken himself out of the labor market. Yes, but he had been working at Securitex within a period of time before. And you also have the vocational rehabilitation counselor saying that the range that he was receiving was what he could obtain. All right. So why would the commission not be able to, you know, use that in establishing the wage differential award? I mean, what's missing other than him actually working at the time that you have conceded is not critical. But, Archibald, isn't the award intended to supplement the income, the lost income, of someone who has had their earnings impaired as a result of their injuries? Well, yes. Isn't that what the evidence is showing you? Right. But is that actually what it would be doing because he's not working? He's not losing. His earnings aren't being impaired because he's not working. How does this not, how do you stop, again, you know, my analogy or my catchphrase of how do you put this genie back in the bottle if you have someone who accepts retirement Social Security benefits under these same circumstances and is never going to go back to work, testifies that I'm never going to go back to work. Do the cases consider Social Security benefits determining an 8D1? I think it's just a fact. Well, no. No, I haven't seen any case like this, period, under these facts. The cases that are cited by me don't consider a situation where the employee has taken himself out of the labor market. Cases cited by a defendant aren't regarding situations or factual situations where the employee has taken himself out of the labor market. This, I think, is a case of first impression on this particular finite issue. Is it required under the Act? That's not for me to answer. I can make arguments as to why I think it should be required because you have these other benefits that are available to an employee such as Mr. Santoyo. He certainly has permanent disability, and he certainly would be able to avail himself of permanent partial disability under the Act. But the question is, which, you know, is this the correct? And that's the point of my appeal. Well, you're making sort of you have an argument that I'll have to concede actually has sort of an intuitive, logical appeal. But I think the response is, does the statute and do any cases incurring or, excuse me, including Durfrey stand for the proposition that the claimant, his decision to remove himself or herself from the labor market precludes a wage differential award? Where is the authority for that holding? Well, I can only speak to possibly to some dicta that was in one of the cases cited by counsel. It was in the Franklin case, citing to the Groveland case, and it's in my reply brief, wherein in that case it stated if the employee is making an honest effort to work and the evidence shows that he's actually earning what he's able to earn, but that is less than he earned before his injury than a fair award for the partial disability he has suffered would be the statutory percentage of the difference. Well, maybe that's the way it was phrased. That dicta could just as well be interpreted on an evidentiary requirement or criteria. Honest effort to go out in the market to show what he's able to earn. You see what I'm saying? That that dicta goes to that, because you've got to have a base there to do the differential. Here the evidence is you have a folk expert who has established a base of what, in his present physical situation, he can earn so we can determine economic loss. And so arguably that dicta really goes to if you don't have a folk expert making those base statements, his activity in working establishes the reality of what he's able to earn. Counsel, your time is up. You can sit down and come up with a good answer in your rebuttal. Okay, thank you. Counsel, please. Good morning, Your Honors. Counsel. May it please the Court. Peter Bobber on behalf of claimant Jose Santoyo. As Justice Hoffman correctly pointed out, I think the crux of the main issue here is the statutory language of Section 8D1 and specifically the provision is earning or able to earn. The Commission here relied on a plethora of evidence as to what Mr. Santoyo is able to earn in a suitable alternative occupation. Your Honors have already pointed out some of the facts that the Commission relied on. In addition to those already noted by the panel, I would also like to draw attention to some others. Specifically, the vocational reports of Martin Power. Those haven't been mentioned yet. Martin Power was the vocational rehabilitation expert who works in-house for Respondent's Workers' Compensation Insurance Company who worked hand-in-hand with Mr. Santoyo monitoring his job search activities. And he was actually the one who recommended that Mr. Santoyo go out, become a licensed security guard, and pursue that line of employment. Mr. Santoyo followed Mr. Power's directions and ultimately was successful in obtaining that license and obtaining alternative employment. Upon Mr. Santoyo obtaining that alternative employment at Securitex, Mr. Power closed his file upon direction from his principal, was his terminology in his report. Mr. Santoyo testified that Mr. Power assented to him accepting the job at Securitex earning $8 an hour. That, coupled with the fact that Mr. Santoyo did hold the job for some time period, and that it is undisputed by the employer that Mr. Santoyo conducted a reasonable job search. Where do you put the Social Security benefits? Or do you even consider them? Your Honor, I don't see the relevance in terms of how we determine a wage differential under Section 81. As Your Honors have already pointed out, the statute is very clear how we calculate the benefits. And as was established early on with my opponent in the argument today, there's no objection as to Mr. Santoyo's inability to earn his prior wage. Can I ask you a question about that prior wage? His prior wage as a mill operator was established by the testimony of Mr. Lee. Mr. Lee is the one that testified that they both worked similar jobs and paid the same hourly rate. And in 2005, Lee earned $78,000 as a mill operator. And they calculated the wage differential based upon Lee's testimony. Lee testified, however, that within his $78,000 was overtime, some of which was voluntary, some of which was involuntary. He is not entitled to include the voluntary portion of the overtime in calculating the average weekly wage, even for wage differential purposes. And no distinction was ever made below as to how much of the overtime that Lee worked that was included within the $78,000 was voluntary. It has to be subtracted out. It can't be there. Involuntary overtime can be, but not voluntary. We've got a line of cases on it. Your Honor, I agree with you as to calculating average weekly wage. It is my position here today that under Section 81, average weekly wage does not apply, specifically because Mr. Lee's testimony was offered. What happened here, I agree with Your Honor. Mr. Lee testified as to his earnings. There was no evidence to the contrary. And he testified that, yes, some of his overtime was mandatory. I think he said he had 48 hours a week was his regular, essentially his regular work week. And then there were additional days that he would come in on a voluntary basis based on his seniority. And some involuntary. Right, correct. I think the 48 was, there were four 10-hour days, so those two additional hours for those four days were mandatory. Your Honor, my reading of the statute, Section 81, it says the difference between the average amount he would be able to earn and the full performance of his duties. It doesn't, it doesn't. Is he going to work the same amount of involuntary overtime as Lee? Or voluntary? Maybe involuntary, but why voluntary? Your Honor, my position is that Mr. Lee testified as to what his earnings were. And the Commission relied on those earnings. My only question is, should they have segregated out the voluntary portion of the overtime, and then they're perfectly free to rely on the remainder. I mean, if one mill operator has to work so many hours of involuntary overtime, well, maybe all of them do. But when you get to voluntary, you know, one guy wants to, one guy doesn't. At best, Your Honor, my position is that Mr. Lee's testimony is very unclear as to what overtime wages were included or were not included. And as a result, the timeline of what happened here I think is very important. Mr. Lee testified on day one of this bifurcated hearing. Day two occurred over 100 days later. Mr. Lee testified as to his earnings for this employer. And this employer had ample opportunity. I know it's my burden, and I appreciate that. I think I achieved my burden. But this employer had every opportunity. Presumably, they have control over all the wage records. They could have brought in all the wage records of all the millwrights. They could have brought in other millwrights somehow attacking Mr. Lee's testimony. There is no other evidence other than Mr. Lee's testimony, which I would agree with, Your Honor, as to overtime. It's unclear exactly how much of that $78,000 would constitute mandatory versus voluntary overtime. But you're saying it's not even required under your interpretation of the act. That's correct, Your Honor. And he's able to earn as much overtime as he voluntarily wants to earn might be what he's able to earn. My review of the case law is I've never seen a case that imposed our Section 10 average weekly wage calculation, including the overtime, voluntary versus mandatory, on a wage differential claim where we're considering what an injured worker possibly could have been earning in the full performance of his original job. In fact, I would ask, Your Honors, to— Now, one problem with that is that you can use that at the top in your argument. But you have a VOC expert who says only that he can earn $8 to $12 an hour. See, if you're going to be able to allow them to put overtime on the top, it seems to me, in all fairness, you've got to allow some evidence or establish some evidence that says this person in their present state of physical state can earn not just $8 to $12 an hour, but security guards often earn work 60 hours a week overtime. You see? I understand, Your Honor. I don't disagree with you. But, however, the facts in this case are such that Mr. Santoyo, when working for security techs, worked 40 hours a week. Okay. The wage stubbed for that job are in evidence. There's no contrary evidence. There was no evidence offered that established that he had available to him a job which would allow him to work 60 hours. I agree. His physical restrictions imposed by the doctor don't preclude any certain number of hours. But there's no evidence that such a job was available. Just like there's – You see, there's an inherent inequity because you're saying I have to show what he is earning. Okay. But yet I can have at the top something that's more. I'm just trying to figure out how we're going to do this. Well, Your Honor, I guess – The easiest way would be to write it and say we're just dealing with 40-hour work week, 2,000 hours a year, and we go by hourly wage in most cases. Well, Your Honor, I guess the way I would reconcile the dilemma you're having is that I would say because of the statute and the way it is, it says the average amount he would be able to earn in the full performance of his duties. By its very nature, the statute is asking us to speculate to some extent. And as best as I could, I presented the evidence that I thought was most appropriate. Ultimately, the arbitrator commission and circuit court did rely on it. And I understand the inequities to which Your Honor is pointing out, but here there is no evidence that he could have worked 60 hours at a security job or 80 hours. There is no such evidence. Their vocational counselor, Mr. Power, never mentioned that he should attempt to get another security job or attempt to supplement that alternative employment in any other way. Counsel, going back to a threshold question, opposing counsel appears to argue that the claimant's voluntary decision to remove himself from the labor market precludes a wage differential award, period. What's your response to that argument? My response, Your Honor, is that that is not mundane or it's not relevant to the 81 calculation and the 81 entitlement. Injured worker. So he doesn't have to do anything? I'm sorry, Your Honor? So he doesn't have to do anything? Well, he doesn't have to do anything, meaning I don't think he has to be working an alternative job. We still have to sustain our burden of proof to be able to prove what the appropriate differential is. And we have to obviously present the commission facts, which would support such an allegation. We just can't come in and claim that he would have been the highest earner at the company and now he can earn next to nothing. And in this case, Your Honor, I think, as I pointed out earlier, I think there's more than ample evidence supporting the commission's finding as to how the calculation was performed here. Thank you. Thank you. Counsel Rebello, please. I want to thank Your Honor for allowing my segue into my second issue with respect to the calculation. You know, I pointed out in my reply brief that counsel's position on the calculation of average weekly wage is, as I understand it, that the method for calculating average weekly wage that we normally use is not applicable to the scenario involving 8D1. I think they refer to average amount in 8D1. How is that interpreted differently than average amount? That's referred to the same catchphrase in Section 10. I think he's asking you to define it in a different way under Section 8D1 than it is under Section 10. I think it's not – there's no provision for that different definition. And with respect to whether or not we provided sufficient rebuttal information or evidence to this, I think the evidence is there. It's right on the record as to what the way that the commission can calculate the average weekly wage. Mr. Lee testified that he worked $48 of mandatory work a week at the union scale. That's what it would be. And he also worked some additional voluntary overtime. I think that was a – I thought was a pretty simple way of getting to that part of the equation being the first part of the – So you're saying there's sufficient evidence there that's just a mathematical computation anyone can do with that, taking that testimony as credible that it's 48 hours a week? I think there was. I think there was no evidence for – or no basis for using the I earned about $78,000. I think that wasn't the appropriate basis. I also – You didn't put in his wage records. Pardon me? You did not introduce his wage records. I didn't. But I thought that the evidence there that he offered was sufficient for the commission to calculate on the basis of his own testimony, on the basis of the union contract that he identified. I had no problem with it, how he was articulating – how Mr. Lee was articulating what Mr. Santoyo would likely be making. The question became how do you define all this voluntary overtime? It's not includable normally, and I think that's the argument that's being made here, that it should be – it doesn't matter because we're talking about 18-1 versus Section 10. The other position that I had with respect to – or the other issue that I had with respect to this particular second issue was the commission in that second part of the equation where you are using either what he is earning or what he is able to earn, used actually what he was earning. I think that's the point in the security job. And didn't – I don't know if – it didn't appear that they considered what he was actually able to earn. If you're looking at what he was able to earn, he's able to earn $8 to $12 an hour on the basis of his own expert testimony. Why do we use the job that he was in six months before the hearing versus what he's able to earn? If we're going to be consistent about this, why don't we consider what he's able to earn by definition from his own vocational counselor in that computation? Thank you, counsel. The court will take the matter under advisement for disposition. We'll stand and recess. Subject to call.